(Supreme Court, Appellate Division, Third Department.    September 10, 1913.)

1. WILLS (§ 55*)—PROBATE PROCEEDINGS—BURDEN OF PROOF—TESTAMENTARY CAPACITY.

   While on the probate of a will the law requires evidence of testamentary capacity, yet the presumption of sanity is so strong that where both subscribing witnesses, one of whom was a trustworthy attorney of excellent standing in his profession and the other a reputable citizen in the community in which he resided, both testified that the testatrix was of sound mind and memory, this made out a prima facie case casting on the contestant the burden of showing incapacity.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

2. WILLS (§ 55*)—PROBATE PROCEEDINGS—SUFFICIENCY OF EVIDENCE—TESTAMENTARY CAPACITY.

   Evidence on the probate of a will offered to show testamentary incapacity *held* insufficient to overcome the prima facie case made by the testimony of the two subscribing witnesses.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

3. WILLS (§ 155*)—VALIDITY—"UNDUE INFLUENCE"—WHAT CONSTITUTES.

   "Undue influence" may be exercised by physical coercion or by threats of personal harm and duress, by which a person is compelled against his will to make a testamentary disposition of his property, or it may consist of procuring a will by working upon the fears or hopes of a weak-minded person, by artful or cunning contrivances, by constant pressure, persuasion, and effort, so that, while the testator willingly and intelligently executes a will, it is really the will of another induced by the overpowering influence exercised upon a weak or impaired mind, but a will which is the result of affection or gratitude or resulting from persuasion which a friend or relative may legitimately use, is not procured by undue influence.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

   For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172.]

4. WILLS (§ 163*)—PROBATE PROCEEDINGS—BURDEN OF PROOF—UNDUE INFLUENCE.

   Undue influence consisting of physical coercion or threats of personal harm or duress can never be presumed, but must be shown by evidence legitimately proving the facts.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

5. WILLS (§ 163*)—PROBATE PROCEEDINGS—BURDEN OF PROOF—UNDUE INFLUENCE.

   That a will was procured by working upon the fears or hopes of a weak-minded person by artful or cunning contrivances or by constant persuasion and effort, so that the will of the testator was overpowered and subjected to the will of another, will not generally be presumed, but must be proved like any other fact by the one alleging it.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

6. WILLS (§ 155*) — SUFFICIENCY OF EVIDENCE — UNDUE INFLUENCE — UNNATURAL WILL.

   Where the only near relative of a testatrix was her mother, who, at the time, was, to the knowledge of the testatrix, possessed of considerable property and in such a weak, feeble condition that she could not long

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

survive the testatrix, and as a matter of fact did survive her only 22 days, her only other relatives being uncles, aunts, and cousins who had no very strong claim upon her bounty, a will, leaving all of her property to a neighbor who assisted in caring for her and her mother in their own home and later in her home, was not so unnatural as to require the application of the rule that a will giving the property to strangers should be closely scrutinized.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

7. WILLS (§ 166*) — PROBATE PROCEEDINGS — EVIDENCE — WEIGHT AND SUFFICIENCY.

In determining the validity of a will, statements of the testatrix as to the future disposition of her property were of slight importance, since such statements are often made to please and gratify the person to whom they are addressed or for some other ulterior purpose.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

8. WILLS (§ 166*)—PROBATE—SUFFICIENCY OF EVIDENCE—UNDUE INFLUENCE.

Evidence showing that the sole legatee under a will was a neighbor of the testatrix, who assisted her and her mother with their work and helped to nurse and care for them in their own home and later in her home, was not sufficient to show the exercise of undue influence, since it merely showed an opportunity to exercise such influence and a quasi confidential relation which is not sufficient.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

Kellogg and Woodward, JJ., dissenting.

Appeal from Surrogate's Court, Otsego County.

Proceeding for the probate of the will of Martha Shaul, deceased. From a decree admitting the will to probate, the contestant appeals. Affirmed.

The following is the opinion of Willis, Surrogate:

Martha Shaul died September 1, 1910, a resident of the town of Springfield, Otsego county, N. Y. She was 52 years of age at the time of her death and had never been married. She left as her nearest relative a mother, Sally Shaul, together with uncles and aunts on her mother's and father's side, and cousins, children of predeceased brothers and sisters of her mother and father. Her mother at the time of the decedent's death was in the neighborhood of 75 years of age, in very feeble health, and died September 23, 1910, possessed of considerable property. The petition in this matter states that the property of the decedent consisted of personal property of the value of about $4,000. The paper which is offered for probate herein is dated and purports to have been executed on the 24th day of August, 1910. It appears from the evidence that the paper was drawn and executed on the said date at the residence of said decedent and her mother in the town of Springfield, Otsego county, N. Y. Objections to the probate of said will have been filed by Otis H. Deck as administrator of the estate of Sally Shaul, now deceased (she being the mother of said Martha Shaul), and also as an heir at law and next of kin of the said Martha Shaul. The principal grounds of the objections are that the decedent was not at the time of the making of said alleged will of sound mind and memory and capable of making a will, and that the said instrument was not her free act and deed, but that the execution of the same was procured and obtained by undue influence. There seems to be no serious question as to a compliance with the statutory requirements at the time of the formal execution of said paper.

[1] Although every person is presumed to be of sound mind and memory, yet the law requires evidence of that fact as requisite to the probate of a

will. The presumption of sanity is so strong, however, that the only burden on the proponent is to produce the subscribing witnesses and obtain their general opinion as to the mental capacity of the testator at the time of the execution of the will. If such subscribing witnesses express an opinion to the effect that at the time of the execution of the will the testator was of sound mind and memory, it is usually regarded as sufficient to cast upon the contestants the burden of showing the incapacity of the testator at the time of the execution of the will. It appears that this paper was drawn by one of the witnesses, who is a trustworthy attorney and of excellent standing in his profession, who also witnessed the will, together with one Myron Van Horne, a reputable citizen in the community in which he resides. The evidence of these two witnesses as to the facts and circumstances in connection with the drafting and execution of this paper and their statements of their opinions as to the mental capacity of said decedent at the time of the execution of said paper are, it seems to me, sufficient, so far at least as the question of mental capacity is concerned, to make out a prima facie case for the proponent, and to cast the burden on the contestant of showing the alleged mental incapacity of said decedent.

[2] There has been offered both on behalf of the proponent as well as on behalf of the contestant a large mass of testimony bearing upon the question of the mental capacity of the decedent at the time of the execution of this paper. In view of the extensiveness of this line of testimony, I shall not attempt to allude to it in detail in this opinion. Numerous witnesses were produced by the contestant who testified to acts, declarations, etc., of the decedent extending over a period of several months prior to her death which they characterized as irrational. This evidence was supplemented by some medical testimony. On the other hand, numerous witnesses were produced and sworn on behalf of the proponent who testified to acts, declarations, etc., of the decedent extending over a period of several months prior to her death which they characterized as rational. The medical evidence produced by the contestant, aside from the distinctly opinion evidence of said medical witness, shows among other things that the decedent's condition was such during the few months just preceding September 1, 1910, that she was much better and stronger mentally and physically upon some days than upon others during that time. It appears that no physician sworn in the case saw her upon the day of the execution of the paper in question. The subscribing witnesses declare her to be of sound mind, etc., on that day. Dr. Kilts testified, among other things, that in his opinion the said decedent from the 1st of August, 1910, did not have sufficient mental capacity to understand and appreciate about her property and affairs and concerns, and did not have sufficient mental capacity to appreciate her obligations to her relatives as the natural objects of her bounty, and did not have mental capacity enough to appreciate and understand about the disposition and regulation of her property; and that from July, 1910, she was insane. Considering this opinion medical testimony in connection with all the other evidence, I do not think, however, that I ought to make such a determination in this case. Therefore, after a very careful perusal and consideration of said testimony as to acts, declarations, etc., of the decedent, the medical testimony and the testimony of the subscribing witnesses, I have come to the conclusion that the contestant has failed to meet the burden imposed upon him as above stated, and that from the evidence it must be held that the said decedent was, at the time of the execution of said paper, of sound mind and memory, and competent to make a will.

[3-5] As to the other ground of objection, which is based upon the claim of undue influence, I feel that upon the whole evidence in the case I should find in favor of the proponent. "Undue influence" may be exercised by physical coercion or by threats of personal harm and duress, by which a person is compelled, really against his will, to make a testamentary disposition of his property. This kind of undue influence can never be presumed. It must be shown by evidence legitimately proving the facts. Marx v. McGlynn, 88 N. Y. 357. I am unable to find any evidence in this case of any undue influence along the lines above suggested. As also stated in the case above cited, there is another kind of undue influence more common than that above referred to, and that is where the mind and will of the testator has been overpowered and

subjected to the will of another, so that, while the testator willingly and intelligently executes a will, yet it is really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind. Such a will may be procured by working upon the fears or the hopes of a weak-minded person; by artful and cunning contrivances; by constant pressure, persuasion, and effort, so that the mind of the testator is not left free to act intelligently and understandingly. It is not sufficient, however, for the purpose of establishing undue influence, to show that the will is the result of affection or gratitude, or the persuasion which a friend or relative may legitimately use; but the influence must be such as to overpower and subject the will of the testator, thus producing a disposition of property which the testator would not have made if left freely to act his own pleasure, and this kind of influence will not generally be presumed, but must be proved like any other fact by him who alleges it. I am unable to see where there is any evidence in this case which brings it even within this rule as to undue influence, which is laid down so clearly in the case above cited, and it seems from said case that the facts showing undue influence under the rule as last laid down must be proven by the person alleging undue influence. • The evidence in this case shows that the physical condition of the mother of this decedent became such in the early part of July, 1910, that the decedent with whom her mother resided, was unable to properly care for her said mother. It also appears that the said decedent was not at that time in robust health. Arrangements were made whereby on July 10, 1910, one Eunice Edick, a married woman living in the vicinity of the decedent, went to the home of the decedent and assisted generally in the housework and the care and attendance of the decedent's mother as well as the decedent from that time until August 27, or ·28, 1910, when the said decedent and her mother moved to the home of said Eunice Edick and there remained until the death of the decedent on September 1, 1910. It appears that the said Eunice Edick remained continuously at the home of the decedent from July 10, 1910, until August 27 or 28, 1910. It also appears that from on or about July 15, 1910, until August 27 or 28, 1910, the husband of said Eunice Edick came to the decedent's home and remained there during the night. There is nothing in this case to show but what the said Eunice Edick had been very sympathetic and thoughtful in her care and attendance upon the deceased and her aged mother. Nor is there any evidence to show that the said Eunice Edick either by artful or cunning contrivance or by pressure or persuasion or effort, attempted to have said decedent make her will in her favor. There was perhaps the opportunity for such contrivance, pressure, persuasion, and effort, but, as it is stated in the Matter of Murphy, 41 App. Div. 157, 58 N. Y. Supp. 453: "Mere opportunity will not suffice. Undue influence must be established affirmatively by circumstances, by acts, and in such a way that the court can see clearly that the will of another has overborne that of a testator."

[6] The rule that a will giving the decedent's property to strangers should be closely scrutinized has but very little application, it seems to me, in this case. The decedent's nearest relative was her mother, who at the time of the making the will was, to the knowledge of the decedent, possessed of considerable property, and in such a weak, feeble condition that she could certainly not long survive, and as a matter of fact, her mother did die 22 days subsequent to the death of the decedent. Aside from her mother, the decedent's nearest relatives were uncles and aunts on her mother's and father's side, and cousins, children of predeceased brothers and sisters of her father and mother. These uncles and aunts and cousins had no very strong claim upon the bounty of this decedent. Under all the circumstances in this case, and in view of the condition of her mother, both physically and financially, I do not think that I should go so far as to hold that the will was unnatural in its provisions and inconsistent with the duties and obligations of this testatrix to her family. The decedent was disposing of her own property, and if she was of sound mind she had the right to dispose of it as she saw fit, providing that she was free from undue influence, and that said disposition was her own voluntary act.

[7] There was some evidence on the part of the contestant as to previous statements made by the decedent as to future disposition of her property.

Such statements are often of very slight importance, made as they oftentimes are to please and gratify the person to whom they are addressed, or for some other ulterior purpose. I am unable to find that there is sufficient evidence along this line in this case to show a fixed determination or intention on the part of the decedent as to the disposition of her property prior to the execution of the paper in question.

I do not think that this case comes within the line of cases mentioned in Marx v. McGlynn in which the law indulges in the presumption that undue influence has been used, such as where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or a person in favor of his priest or religious adviser, or where other close confidential relationships exist. There is no evidence in this case of any confidential relationship existing between this decedent and said Eunice Edick, other than what may be inferred from the fact that she was at the home of the decedent during the period above stated in the capacity of a servant. It is apparent that she thus went to the home of the decedent at the time when the decedent was in great need of assistance in her home, and that in thus going to the home of the decedent said Eunice Edick seriously inconvenienced herself and her family, consisting of her husband and children. This relationship and association between the decedent and said Eunice Edick came about as a result of the circumstances existing at the time that Mrs. Edick went to the home of the decedent to care for her and her mother. It was apparently absolutely necessary at that time that the decedent should have some help in her home, and there is no evidence that Mrs. Edick in any way forced herself upon the decedent. There is nothing in the case showing that any of the relatives of the decedent were coming to her assistance and relief at this time. If this decedent, being therefore of sound mind at the time of the execution of this paper, and not under any undue influence, thus gave her property to said Eunice Edick realizing that her mother would never need it, and out of appreciation for what Mrs. Edick was doing for her and her mother, it was her undisputed right to do so. I think that this will should be admitted to probate.

The terms of the decree and the questions as to costs will be settled at a term of the Otsego County Surrogate's Court to be held at the Surrogate's office in the village of Cooperstown, Otsego county, N. Y., on the 5th day of February, 1912.

Decreed accordingly.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Snyder, Cristman & Earl, of Herkimer, for appellant.
Byard & Van Horne, of Cooperstown, for respondent.

HOWARD, J. Martha Shaul died September 1, 1910. Before she died and on August 24, 1910, she is said to have executed a will. The will was prepared by Orange L. Van Horne, a lawyer of Otsego county and the district attorney of that county. At the time of the alleged execution of the will the decedent and her mother, aged 75 years, lived alone. The mother was an invalid; the decedent was in ill health. They called in a married neighbor woman, one Eunice Edick, to assist them with their work and help nurse and care for them. She was paid for this work. The decedent was a maiden lady; she had never married. She had no children and left surviving her only uncles, aunts, and cousins. She had not been very intimate or friendly with most of these. Just before she died she and her mother went to the house of Eunice Edick to live. In her will she left all her property to Mrs. Edick. The will is contested by those relatives who would inherit if there were no will. The Surrogate has decided in favor of the validity

of the will, and an appeal from his decree brings the case into this court.

[8] There are only two questions for our consideration, namely: Was there undue influence? Did the decedent possess testamentary capacity? As to the first question there is absolutely no proof in the case of the exercise of undue influence. There was opportunity, and there was a quasiconfidential relation. This is all that cán be said; this is not enough. Mrs. Edick was a married woman, a neighbor, a friend. She did as neighbor women frequently do under such circumstances; she took such care of the two invalid women as she could and did the housework. She took pay for her services. Finally, being pressed by her own domestic duties, she took the two old women to her own house and cared for them there till they died. These acts, so far as the proof goes, comprise the "head and front of her offending." No will was ever invalidated for such reasons—no will ever should be.

As to the testamentary capacity the contestant produced quite an array of experts and interested relatives and some others. From it all, as one reads the testimony, it would seem at times as though the woman were a complete imbecile in the last stages of senile dementia; and then, again, out of the mouths of the same witnesses, perhaps, she would appear to display a cunning and business capacity quite uncommon. But the Surrogate saw all these witnesses; he heard them testify; he knows them all. He decided against them, and his careful analysis of the facts in his able opinion shows that he was fully warranted in so doing.

Despite the attack upon Mr. Van Horne, I have no doubt that the Surrogate was influenced greatly by his testimony. I have been so influenced in the conclusion which I have reached. It would have been better, perhaps, had Mr. Van Horne employed other counsel to conduct this litigation and acted himself only in the capacity of witness; but notwithstanding his indiscretion, if it was indiscreet, in acting both as witness and lawyer, I attach great importance to his testimony. He is not one of those familiar legal characters whose shady reputation always arouses suspicion. On the other hand, Mr. Van Horne is a young man apparently of high standing in his community; he is a lawyer of excellent reputation; he is the district attorney of his county. He argues cases before us and we have had an opportunity to observe him. He seems to me to be clean and able and straightforward; I think we should hesitate to repudiate him.

Every will case must stand upon its own peculiar circumstances; but in this case I do not think we should strain a point to take this money away from Mrs. Edick, the only person who displayed any human compassion towards the deceased, and give it to unworthy relatives. Courts can have but little respect for the claims of distant relatives who remain wholly unconcerned about the comfort and affairs of their kinsmen while they are alive but pounce like vultures upon their estates when they are dead. Neither should the law encourage their claims—at least, not to the jeopardy of those who merit gratitude and reward at the hands of the deceased.

I recommend that the decree be sustained on the opinion of the Surrogate. All concur, except KELLOGG, J., dissenting in opinion in which WOODWARD, J., concurs.

JOHN M. KELLOGG, J. The learned Surrogate did not give sufficient attention to the fact that when the will was made the testatrix was entirely under the control of the residuary legatee. Ordinarily an attorney, a physician, or a nurse who obtains a will in his favor is called upon to show that the will is not the will of the beneficiary but that of the alleged testator. The mere formal execution of such a will is not sufficient. All the physicians, three in number, swear that the testatrix was incompetent. She was about 52 years of age and resided upon the old homestead with her father and mother. The father died April 20, 1910; the mother was very feeble, 75 years of age, and required constant care. After the father's death she was melancholy and in a failing condition. The beneficiary came to the homestead as nurse July 10th, the will was made August 20th, and on August 27th the beneficiary removed the decedent and her mother from the old homestead to her house. Decedent died there September 1st. The mother died September 23d. No particular relations are shown between the beneficiary and the decedent except that the beneficiary was in the family as nurse for a few days prior to the making of the will and performed her duty to the satisfaction of the employer. But she was paid for doing that, and such service is no good reason in itself why she should be sole beneficiary under the will.

The attorney who drew the will witnessed it and appeared in Surrogate's Court and in this court in its defense, and therefore has an interest in the litigation. He swears that Mrs. Shaul gave him the directions for making the will, but that he received the directions and made the will in the presence of the beneficiary. He did not see the mother, who was in the house. Other relatives lived in the vicinity. As he entered the house he spoke to one of the relatives who was at work upon the farm. He does not seem to have exercised the care that would naturally be expected under all the circumstances of this will. The family physician could very properly have been called as a witness. Aside from the confidential relations between the alleged testatrix and the beneficiary, there is grave question as to the competency of the testatrix. Her feebleness of mind and body, in connection with the relations existing, throws a great doubt upon the validity of the will. The fact that she permitted herself and her mother to be removed from the old homestead by the nurse so shortly after the death of the father and husband is quite strong evidence that the mind of the nurse was the controlling mind.

The decree of the Surrogate should be reversed as against the evidence, and a new trial before a jury directed, with costs to the appellant to abide the event.